453 F.2d 455
 Reverend Leon HOWARD and Barney Schoby, Individually and on
behalf of all others similarly situated,
Plaintiffs-Appellants-Cross Appellees,
v.
ADAMS COUNTY BOARD OF SUPERVISORS et al.,
Defendants-Appellees Cross Appellants.
 No. 71-2361 Summary Calendar.*
 United States Court of Appeals,
Fifth Circuit.
 Jan. 6, 1972.
Rehearing and Rehearing En Banc Denied Feb. 25, 1972.
 
 Frank R. Parker, George Peach Taylor, Jackson, Miss., for plaintiffs-appellants.
 Lucien C. Gwin, Jr., Lucien C. Gwin, Natchez, Miss., for defendants-appellees.
 Before GEWIN, GOLDBERG and DYER, Circuit Judges.
 DYER, Circuit Judge:
 
 
 1
 Howard and Schoby, black citizens of Adams County, Mississippi, filed a class action attacking a county-wide redistricting plan adopted by and for the election of the Adams County Board of Supervisors. The focus of this appeal is the district court's denial of relief of plaintiffs' claim that the new plan is constitutionally impermissible as a racially motivated gerrymander, operating to dilute the voting strength of the blacks of Adams County. We affirm.[1]
 
 
 2
 Adams County is the southwesternmost county in Mississippi, having as its western boundary the Mississippi River. The only incorporated municipality in the county is the City of Natchez, situated on the river at the approximate center of the western boundary of the county. The total population of the county in 1960 was 37,730, the City of Natchez consisting of 23,791 or 64% of the total population. The ratio of blacks to whites in the county is roughly one to one, 48% black-52% white. The black population of the county is heavily concentrated in the City of Natchez, with the concentration extending into the rural areas that border northwestern Natchez and comprise the northwestern corner of the county.
 
 
 3
 As late as 1970, the Board of Supervisors, the county's legislative body, was elected from five electoral districts which varied in population from 800 to 16,832. These districts were patently malapportioned. Redistricting was essential to a constitutionally valid election in November of 1970 under the one-man, one-vote mandate of Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506. Accordingly, in January of 1970 the Board of Supervisors retained Comprehensive Planners, Inc. (CPI) to prepare a redistricting plan. The resulting plan was adopted by the Board on November 2 of that year. The Board submitted the plan to the Attorney General of the United States for his approval pursuant to Sec. 5 of the Voting Rights Act of 1964, 42 U.S.C.A. Sec. 1973c. No objection was interposed.
 
 
 4
 Equality of population in electoral districts was a primary goal of the revision. Another objective, however, was the equalization of the responsibilities of each Supervisor in exercising their traditional function of highway and bridge maintenance. Thus, the Board instructed CPI not only to equate, as best it could, the population of the districts, but also the mileage of roads for county maintenance, and the square mile area of each district. With its land area largely rural, and its population concentrated in one urban area, the realization of these legitimate planning objectives dictated a plan which would consolidate urban and rural areas into each district. As the new plan was developed, therefore, each district converged in spokelike fashion from a broad rural base into the City of Natchez. This dissection of the population concentration of the county resulted in an equal allocation of the population of Natchez among the new districts. Under the population figures available to CPI in 1970, prior to the publication of the 1970 census, the result was a plan in which substantial equality of population was reached in districts that reflected cross sections of urban and rural land areas.
 
 
 5
 The allocation of the population concentration of the city resulted in the removal of some 7000 blacks from old Supervisor District Four, where prior to the implementation of the plan 60% of the blacks in the county lived and commanded a 75% population majority. These blacks, now residing in new districts other than Four, found themselves in electoral districts where blacks no longer represented a majority of the population. The reallocation of the population of Natchez, on the other hand, substantially balanced the racial ratio of the population in new Districts Three, 51% white, 49% black, and One, 55% white, 45% black, and resulted in a significant amelioration of the racial population disparities in the other two districts, although whites there continued to constitute a 60%-40% population majority.
 
 
 6
 Plaintiffs object to the CPI plan as a racially motivated gerrymander, contending that as a result of the shift of a part of the highly concentrated black population of the county, the voting strength of blacks as a legally cognizable racial element was unconstitutionally diluted and the effectiveness of their franchise correspondingly reduced. Their claim is essentially based upon the Equal Protection Clause of the Fourteenth Amendment. Specifically, plaintiffs argue that this dilution is represented by the difference in effective voting power blacks now command in Adams County, under the new plan, and the effective voting power blacks could command if the revision had been drawn to recognize their population segment of northwestern Adams County as numerically large enough and geographically contiguous enough, to constitute two electoral districts in which blacks would retain a significant population majority. Further, as a side effect of the plan, it is urged that these blacks, Howard and Schoby included, who formerly were part of the majority class in old District Four, and now are a minority class in each of the new electoral districts, have suffered a more serious dilution of their voting power since they are "denied the right to vote in a district where they constituted a majority prior to the redistricting" and could "elect black candidates if they so chose."
 
 
 7
 A long line of cases beginning with Gray v. Sanders, 1963, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 and Reynolds v. Sims, supra, teaches that each citizen must have an equally effective voice in the election of his legislative representative by requiring substantial equality of population in electoral districts. Malapportionment, however, is not the only evil which this effectiveness guarantee is designed to combat. It is also aimed at the gerrymander. It is the gerrymander, not malapportionment, that is at issue in this appeal.
 
 
 8
 The gerrymander is as great a threat to equality of representation as malapportionment. While malapportionment generally emphasizes considerations of the weight of an individual's vote, a gerrymandering operates to destroy the effectiveness of the franchise by diluting the vote of recognizable racial, ethnic, or political groups in order to benefit a favored interest.
 
 
 9
 As we view the constitutional requirements in this area, to establish the existence of a constitutionally impermissible redistricting plan, in the absence of malapportionment, plaintiffs must maintain the burden of proving (1) a racially motivated gerrymander, or a plan drawn along racial lines, Wright v. Rockefeller, 1964, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512; Gomillion v. Lightfoot, 1960, 364, U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110; Sims v. Baggett, M.D.Ala.1965, 247 F.Supp. 96, or (2) that ". . . designedly or otherwise, a[n] . . . apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population." Burns v. Richardson, 1966, 384 U.S. 73, 88, 86 S.Ct. 1286, 1294, 16 L.Ed.2d 376. See Whitcomb v. Chavis, 1971, 403 U.S. 124, 143-144, 149, 91 S.Ct. 1858, 29 L.Ed.2d 363.[2]
 
 
 10
 First, a careful consideration of the record leaves us in complete agreement with the finding of the district court that plaintiffs failed to sustain their burden of proving that the CPI plan was the product of a racial motivation or purpose. See Wright v. Rockefeller, supra, 376 U.S. at 56, 84 S.Ct. 603. The record is bare of such evidence. The district court was correct in holding that CPI did not consider, nor were they instructed to consider, the racial makeup of the districts to be drawn.
 
 
 11
 Plaintiffs more forcefully urge that the new plan has resulted in an impermissible dilution of the voting strength of their class in violation of the rule established in Burns, supra. But following the change of district boundaries, blacks in District Four continue to enjoy a 67% population majority. Blacks in District Three command the same population percentage as do whites, and a population percentage greater than the percentage of population they represent county-wide. In District One, whites outnumber blacks by only 10%, 55% to 45%, and blacks again constitute about the same population ratio as they do county-wide. In Districts Two and Five blacks continue to remain in the minority, representing 40% of the population in each district. The obvious reason for this disparity is their continued enjoyment of a heavy population majority in District Four.
 
 
 12
 These considerations lead us to approve the finding of the district court that plaintiffs failed to sustain their burden of showing that the new plan is a constitutionally impermissible dilution, minimization, or cancellation of the voting strength of the black citizens of Adams County. See Whitcomb v. Chavis, supra, 403 U.S. at 144, 91 S.Ct. 1858. On the contrary, we find that the plan passes constitutional muster. Further, we reject the plaintiffs' notion that they are constitutionally entitled to have old District Four divided into two predominantly black electoral districts simply because they command a population concentration of sufficient size and contiguity to constitute two equally apportioned districts. This rationale was rejected by Justice White for the majority in Whitcomb, saying that such a contention
 
 
 13
 ". . . [is] expressive of the more general proposition that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization . . . who live in what would be safe districts in a single-member district system but who . . . are submerged in a one-sided . . . vote.
 
 
 14
 . . . [It] is not at all clear that the remedy is a single-member district system with its lines carefully drawn to ensure representation to sizable racial, ethnic, economic or religious groups and with its own capacity for over- and underrepresenting parties and interests . . ."
 
 
 15
 403 U.S. at 156, 160, 91 S.Ct. at 1875.
 
 
 16
 For the reasons already explicated, we reject the separate claim by Howard, Schoby, and the class they represent that they have suffered a separate unconstitutional dilution by denial of the right to vote in a district where they constituted a majority class prior to redistricting. Inevitably, people of different races, national origins, and contrasting tenets will be shifted under reapportionment plans to districts in which they may no longer be in the clear majority. But when, as here, no racial motivation spawns a change of the voting area of those complaining, and the redistricting plan does not unconstitutionally dilute the voting strength of the complaining minority, there is no abridgement of voting rights.
 
 
 17
 Affirmed.
 
 
 18
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 19
 The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.
 
 
 
 *
 Rule 18, 5 Cir.; See Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I
 
 
 [1]
 The district court in this case found that the population of the new districts deviated in equality to such an extent that they are unconstitutional under Abate v. Mundt, 1971, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399, and ordered the Board to present a constitutionally acceptable modification to the plan by December 1, 1971, in order to comply with the one-man, one-vote requirement. This Court, in denying a motion by plaintiffs for an injunction pending appeal, ordered the Board, upon approval of a plan by the district court, or not later than May 16, 1972, to hold final elections for the Board under a constitutionally acceptable plan. These orders are, of course, not at issue in this appeal
 
 
 [2]
 While the "dilution" test developed in Burns, and expanded in Whitcomb, is used in those cases to test the constitutionality of multi-member district plans, we have no hesitation in applying that test as a measure of the constitutionality of reapportionment plans involving only single-member districts. In each instance, we are required to determine the same question, whether or not there has been an unconstitutional manipulation of electoral district boundaries so as to minimize or dilute the voting strength of a minority class or interest