Henry J. **KIRKSEY** et al., Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

**BOARD OF SUPERVISORS OF HINDS COUNTY, MISSISSIPPI** et al., Defendants-Appellees.

No. 75–2212.

United States Court of Appeals, Fifth Circuit.

Feb. 24, 1976.
Rehearing En Banc Granted
May 12, 1976.

Frank R. Parker, Herman Wilson, Lawyers' Comm. for Civil Rights Under

Law, Jackson, Miss., for plaintiffs-appellants.

Jessica Dunsay Silver, Atty., Appellate Section, U. S. Dept. of Justice, Civil Rights Div., Appellate Division, Washington, D. C., amicus curiae.

Thomas H. Watkins, John M. Putnam, William Allain, Jackson, Miss., for defendants-appellees.

Before BELL, COLEMAN and GEE, Circuit Judges.

GEE, Circuit Judge:

Plaintiffs appeal from the decree of the district court adopting and promulgating a redistricting plan for the election of county supervisors and others[1] in Hinds County, Mississippi, a central-Mississippi county and the seat of the state capital. They properly represent a class: all black registered voters of Hinds County qualified to vote for county officers elected from its districts. Their basic complaint is that the court's plan dilutes and cancels out black voting strength for these offices. We affirm.

### History of this Litigation

In 1969, pursuant to court order, the county was reapportioned to comply with the equal vote requirements of *Avery v. Midland County.*[2] In mid-1971 this suit attacked that plan as wanting section 5[3] clearance by the Attorney General, as diluting the black franchise, and as malapportioning the county under *Avery.* A three-judge court, convened at plaintiffs'

request to consider the section 5 count, was dissolved when plaintiffs nonsuited that count. In late 1972, the district court, acting on stipulated 1970 census data and after conferring with counsel, found that in light of the 1970 data the 1969 plan clearly malapportioned the county,[4] and it ordered the defendant supervisors to submit a new plan correcting the population discrepancies, "formulated without regard to the race, creed, sex or national origin of any citizen of Hinds County . . . ."

The following June, the supervisors filed their recommended plan[5] with the district court. Plaintiffs filed timely objections and their own suggested plan, which essentially created two districts out of the black residential bloc in Jackson and joined the remainder of the bloc to three rural districts covering the rest of the county. After a lengthy delay—slightly over a year—trial on the merits was had, and an opinion and judgment followed in April 1975. The opinion incorporated many findings of fact, summarized in significant part hereinafter, a few of which are attacked as erroneous. On the basis of these findings and its conclusions of law, the court approved the supervisors' plan, authorized and directed the supervisors to put it into effect, and rejected plaintiffs' plan.

Before us plaintiffs challenge these actions of the district court and seek attorneys' fees.

### The Court's Findings

The court's findings of fact are extensive and are, in the main, not disputed

---

1. The supervisors' duties comprise, in main, maintenance of county roads and bridges, care of the needy, levy of county taxes, maintenance of the county courthouse and jail, planning and zoning in unincorporated county areas, and providing for public health and welfare in the county. The supervisors' districts also serve as election districts for members of the county board of education, justices of the peace and constables.

2. 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed. 45 (1968).

3. Voting Rights Act of 1965, 42 U.S.C. § 1973c (1970), as amended, 42 U.S.C. § 1973c (Supp. 1976).

4. Finding, also, however, that it was a good-faith effort to comply with the court's order and had resulted in substantial equality in districts as of December 1969, when it was implemented.

5. Prepared by independent consultants who followed, as they testified and the lower court found, the court's instruction to disregard race, etc.

by plaintiffs.[6] They commence with matters relating to the background and history of this litigation, such as the bona fide nature of the 1969 redistricting attempt, the court's directing the defendant supervisors to prepare a new plan, and the requirement that this plan be formulated without reference to race, etc. as criteria.

Hinds County is described in them as demographically and economically similar to many other areas of the South:[7] a main town or city, in and around which population is concentrated, surrounded by a less-developed and sparsely-populated hinterland. The population figures for Hinds County, by the 1970 census, are noted to be 214,973, of whom 130,590 (60.75%) are white, 84,064 (39.10%) are black, and the remaining 317 (0.15%) are of other races. For the City of Jackson, the proportions are similar: 60.1% (92,651) of its residents are white, 39.7% (61,063) are black, and 0.1% (254) are of other races.

Next, the court examines the parties' proposed plans for reapportionment and finds both clearly acceptable, the largest population variance between districts in either being less than four percent. Considering first the defendant supervisors' plan, the court found it

> does achieve the primary goal of a reapportionment plan of equality of population within constitutional guidelines,

while at the same time equalizing as nearly as practical under the circumstances the important subsidiary factors of road and bridge mileage and land area, assigning to each district substantial numbers of both urban and rural residents. This result is accomplished under the Board plan with a minimal disturbance or change of existing election districts and voting places.

Noting that "[t]he plaintiffs are critical of the [supervisors'] proposed plan's utilization of long corridors into the City of Jackson from the rural land mass in order to achieve the required equalization of population," the court observed that "it is absolutely impossible to draw five districts without splitting the urban area of Jackson into five parts and still realize the other desirable planning objectives of equalization of road and bridge maintenance responsibilities and the substantial equalization of areas between the districts."[8] And though "the utilization of the long corridors into an urban area does create rather unusual looking supervisors' districts," the court found that the boundary lines of the districts "do follow, so far as possible, natural boundaries such as rivers, highways, railways, and other landmarks traditionally used to designate district boundaries."

The court next considered expert testimony by the architect of the supervisors'

---

**6.** Plaintiffs' factual attack is limited mainly, if not entirely, to one on ultimate facts or legal conclusions of the district court:

> [T]he District Court concluded—erroneously we believe—that plaintiffs have failed to prove that their voting strength is minimized or cancelled out "in any way" by the Board's plan, and that the Board's plan offers Hinds County Blacks a "realistic opportunity to elect officials of their choice, whether white or black, in two supervisors' districts . . ." (Mem.Op., pp. 26–27). The dispersal of the heavy Black population concentration in Jackson was justified as "necessary . . . in order to achieve equalization of population with approximate equalization of road mileage and land area" (id., p. 13). Past denials to Hinds County Blacks of equal access to the political process were considered irrelevant (id., p. 33). The court sustained the Board's 1973 redistricting plan as meeting all constitutional re-

quirements, and rejected plaintiffs' alternative plan, based on Census tracts, as "intentional gerrymandering" to create two safe Black majority districts (id., p. 34).

> These latter findings, we contend, are completely inconsistent with the District Court's own findings on fragmentation of Black voting strength, are contrary to the uncontradicted and undisputed evidence in this case, are unsupported by substantial evidence, and are clearly erroneous. Rule 52(a), F.R.Civ.P.

**7.** See Moore v. Leflore County Bd., 502 F.2d 621 (5th Cir. 1974) (Greenwood, Miss.), noted in the district court's findings, and Howard v. Adams County Bd., 453 F.2d 455 (5th Cir. 1972) (Nachez, Miss.).

**8.** The court also found that these considerations had "always" been a legitimate concern of the supervisors. Cf. note 1 supra.

plan that he compiled no racial data concerning the plan before drawing it and, as ordered, gave no consideration to race in his drafting of it. The court found as a fact—a finding that is not assigned as error to us—that race was "wholly disregarded" in preparation of that plan. Finally, the court set out raw population tables for the pre-1969 districts, for districts under the 1969 plan, and for the supervisors' proposed plan. These show that under the pre-1969 plan blacks held great majorities (about 76% and 68%) in two of the five districts but that these were each egregiously malapportioned under the *Avery* rule.[9] As to the 1969 plan, the figures indicate white majorities in each of its five districts, some probably decisive (68/32) and some perhaps not (54/46), as well as serious, doubtless-invalidating malapportionment.[10] The 1973 or proposed supervisors' plan reflected proper apportionment and the following racial proportions in the general population:

The court next discussed testimony offered by an expert witness for plaintiffs about voting-age (as contrasted with general) population proportions in the county and, by extrapolation only, in the districts. By this analysis, because of the systematic departure of adult blacks from Hinds County, the black/white voting-age proportions in the county were calculated at roughly 34/66. Admittedly extrapolating on the assumption that this county-wide proportion would hold roughly true for each district, the expert indicated that, as is obvious, the already commanding white majorities in Districts 1, 3 and 4 would be increased, and that the black majorities in Districts 2 and 5 would become voting-age minorities of

48% and 48.6%, respectively. The court thought that these conclusions, though subject to an uncertainty of 1 to 2% inherent in the extrapolation, were "to some extent" confirmed by calculations from census data made by another of plaintiffs' expert witnesses.[11] An offer of proof made by plaintiffs' first expert about *registered* black voters in Districts 2 and 5 placed the percentages of registered blacks at about 41% for each, though the evidence was excluded because the study from which it was drawn was not offered in evidence, a ruling to which no error is assigned.

Next reviewed by the court was a considerable list of discriminatory actions taken in the past against black voters in Hinds County and in the state generally. These include such matters as the total lack of any success by black candidates in county elections, past poll tax, literacy and property qualifications on the franchise, and so on, as well as past behavior of Hinds County supervisors indicating unresponsiveness to the black citizen: systematic exclusion of blacks from jury rolls, maintenance of discriminatory educational facilities in the county, etc., some of which had been removed by past orders of the court itself in earlier cases.[12] In this connection, however, the court noted that these practices had decreased rapidly in number and severity in recent years, and that no evidence of denial of registration on racial grounds since enactment of the 1965 Voting Rights Act appeared in the record. In view of this and of testimony about the registration of thousands of eligible blacks since 1965, the court ascribed the failure of Hinds County blacks to register to lack of interest rather than to

9. One of them contained less than six thousand people and the other less than eight thousand, while another district exceeded one hundred thousand in population—the ideal being about forty-three thousand.

10. Though not so severe as under the pre-1969 plan: the largest 1969-plan district included just over 51,000 souls and the smallest, 33,336, as compared to the 43,000 ideal.

| District Number: | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| White %: | 70.5 | 46.6 | 72.3 | 68.0 | 46.0 |
| Nonwhite %: | 29.5 | 53.4 | 27.7 | 32.0 | 54.0 |

11. Recognized by the court as an expert generally in political science, especially as to political behavior and attitudes, but not in county redistricting. These calculations indicated a black voting-age population in each of the two districts of about 47%.

12. *E. g., Love v. McGee*, 297 F.Supp. 1314 (S.D.Miss.1968) (jury service).

official discouragement. On these and other considerations detailed in the record, the court found that past abuses have no current significant effect in Hinds County on black access to the political process. So concluding, the court approved the supervisors' plan as offering the 40% black segment of Hinds County's populace a realistic opportunity to elect officials of its choice in two districts and a significant voice in the other three. Plaintiffs' plan was found deliberately to create two "safe" black districts (66/33 and 68/31), both entirely urban with no significant road or bridge mileage, and thus to fail both on constitutional and practical grounds. Having so found the facts, the district court proceeded to legal conclusions which we will consider shortly. Before doing so, we turn aside to take up the suggestion of the United States as amicus curiae that the court could not implement the plan submitted by the supervisors without submitting it first to the Attorney General for section 5 clearance.

### Section 5 Approval

■ Section 5 of the Voting Rights Act of 1965, as amended by 42 U.S.C. § 1973c (Supp.1976), requires clearance from the District Court for the District of Columbia or the United States Attorney General before a state or one of its political subdivisions covered by the Act implements any standard, practice, or procedure with respect to voting different from that in effect on November 1, 1964. According to the Supreme Court in *Connor v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971), as interpreted by this circuit in *Zimmer v. McKeithan*, 467 F.2d 1381 (5th Cir. 1972), *rev'd on other grounds on rehearing en banc*, 485 F.2d 1297 (1973), section 5 applies to plans produced by political subdivisions reapportioning themselves but not to *"court ordered plans* resulting

from equitable jurisdiction over adversary proceedings." *Id.* at 1383 (emphasis in original).

Amicus argues, however, that section 5 applies to court-approved plans unless they are court-*formulated.* Thus, amicus' rule would subject to section 5's prior-approval requirement those proposed plans that the court adopts as submitted but not those prepared by the court itself or those adapted from a party's suggestions with minor changes. The suggested rule is not a practical one. Under it, for example, a party is penalized[13] for submitting a plan thought by the court to be completely adequate but rewarded for the near-adequate submission that requires minor revision. And one plan embodied in a court decree is subjected to screening by the Attorney General, though another—just as fully embodied—is not. More fundamentally, plaintiffs' contention misses the point of *Connor* and *Zimmer.*

For we think it the true rule that application of section 5 turns on the source from which a plan derives its legal force: if from a state instrumentality, section 5 applies; if from a court, it does not. Here the district court instructed the county Board to develop a plan, found the plan constitutionally acceptable, and ordered its implementation.[14] Thus, the plan drew its legal force from the court and does not require section 5 clearance.

### Validity of the Plan Adopted

One who would offer to a district court a suggested electoral redistricting of such a county as Hinds must walk a narrow line. To begin with, the physical situation presented is inherently difficult: a rural county containing one significant metropolis, which itself encompasses a racial enclave, and a black population that must not be " 'designedly or *otherwise*' " treated so as to minimize its

---

**13.** In the sense that the plan must pass additional scrutiny before it can become effective.

**14.** Unlike *Connor v. Waller,* 421 U.S. 656, 95 S.Ct. 2003, 44 L.Ed.2d 486 (1975) (per curiam), where the Court required section 5 clearance of a court-approved plan voluntarily enacted by a state legislature. The D.C. Circuit recog-

nized a similar distinction in *Harper v. Levi,* 520 F.2d 53, 72 & nn. 161, 164, 165 (D.C.Cir. 1975), which required section 5 approval of a court-ordered substitute plan adopted by a state legislature after litigation had successfully challenged the legislature's prior, voluntarily enacted plan.

voting strength. *Burns v. Richardson*, 384 U.S. 73, 88, 86 S.Ct. 1286, 1294, 16 L.Ed.2d 376, 388 (1966) (emphasis added), *quoting Fortson v. Dorsey*, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401, 405 (1965).[15] On the other hand, the minority " 'is not constitutionally entitled to an apportionment structure designed to maximize its political advantage.' "[16] And so it appears the designer's lines should[17] be drawn so as to avoid favoring and *must* be drawn so as not to disfavor the minority group of which the internal racial bloc is a part. Perhaps it would be prudent, he may reflect, to draw no lines at all, since their location is such a ticklish matter. But this option is all but eliminated by *Connor v. Johnson*, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971), and its holding that multi-member districts are not favored in court-ordered plans. Lines must usually be drawn, it seems; and, at least where election districts for county supervisors are concerned, practical considerations urge that they be drawn so as to include proportionate urban and rural areas within each district, since the supervisors' duties are, while perhaps primarily rural-oriented,[18] far from exclusively so. Finally, of course, under *Avery* the districts must contain about the same number of people. A task indeed! One which, with the addition of only a tincture of malice or exasperation to the cloud of seemingly overlapping negatives set out above, can be cast as impossible.

Nevertheless, it is not. We recognize that it is of the essence of a court's duty to articulate the law in such a form that it can be followed. A failure to do so—especially in an area so vexed as this—leaves those who must plan and act without guidance. Worse, enunciation of impractical or conflicting principles leaves them paralyzed, unsure of the criteria by which their conduct will be measured in the event. Our most recent statement or synthesis of the principles governing this case is that of Judge Rives, quoting Judge Hill in part, to be found in his opinion for the panel majority in *Gilbert v. Sterrett*:

> The constitutional test actually applied by the district court was stated in its opinion as follows:
>
> > It is well established that to prove the existence of a constitutionally impermissible redisricting [sic] plan in the absence of malapportionment, plaintiffs must show (1) a racially motivated gerrymander, or a plan drawn along racial lines,[3] or (2) the
> >
> > [3] *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Howard v. Adams County Board of Supervisors*, 453 F.2d 455 (5th Cir. 1972), cert. denied 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972).
> >
> > apportionment plan would operate to minimize or cancel out the voting strength of racial or political elements of the voting population.[4] An
> >
> > [4] *Burns v. Richardson*, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966); *Howard v. Adams County Board of Supervisors*, 453 F.2d 455 (5th Cir. 1972), cert. denied 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972).
> >
> > apportionment scheme is not constitutionally impermissible merely because its lines are not carefully drawn to ensure representation to sizable racial, ethnic, economic or religious groups.[5]
> >
> > [5] *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

.    .    .    .    .

Though stated in different language, that standard of law does not differ materially from the standard as variously stated by this Court in *Zimmer v. McKeithen* (*en banc*), 5 Cir. 1973, 485 F.2d 1297, 1303; *Turner v. McKeithen*, 5 Cir. 1973, 490 F.2d 191,

---

15. *See* cases cited note 7 *supra*.

16. *Gilbert v. Sterrett*, 509 F.2d 1389, 1394 (5th Cir. 1975), *quoting Turner v. McKeithen*, 490 F.2d 191, 197 (5th Cir. 1973). *See generally Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).

17. Perhaps "must" here also, for to favor one of two racial groups seems necessarily to disfavor the other, and each presumably has equal constitutional rights in the franchise.

18. *See* note 1 *supra*.

193–197; *Moore v. Leflore County Board of Election Commissioners,* 5 Cir. 1974, 502 F.2d 621, 623, 624; *Robinson v. Commissioners Court, Anderson County, 5 Cir. 1974, 505 F.2d 674.* 509 F.2d at 1390–91.

■ Applying these principles to this case, the rule against racial gerrymanders and plans drawn along racial lines is satisfied by the supervisors' plan. Its draftsman testified that, as instructed, he drew it without reference to race. His evidence is not disputed, and its weight is not overcome by the facial appearance of the plan. On this evidence the district court found it was drawn without reference to race, and its finding is not clearly erroneous. Plaintiffs' plan, to the contrary, obviously runs afoul of the rule and is unacceptable. As noted above, it creates two voting districts, neither with significant road or bridge mileage or rural population, out of the core of the black population concentration in Jackson. Whether or not it is, as the court below found, a racial gerrymander, it is plainly drawn along racial lines alone and is obviously designed to secure two of five seats for the minority enclave while conceding three "safe" seats to the white majority.

It remains to determine whether the supervisors' plan approved by the court below, though not by design, *otherwise* —that is, unintentionally—operates to minimize minority voting power in an impermissible way. To determine whether that power is minimized, we must first ascertain its proper or natural magnitude, its expectable effect under normal conditions when neither weakened nor enhanced. And this is simply stated: in an infinite series of elections, any 35% of the electorate should elect 35% of the candidates whom it favors or, in other words, it should receive propor-

tionate representation. As applied to any hypothetical five-man board, then, our 35% voting bloc should be represented by two out of five officials favored by it about three-fourths of the time and by only one of the other fourth. This model illustrates its normal voting strength.

Plaintiffs are correct when they insist that we consider whether the impact of the black vote in Hinds County is diminished by the proposed plan. Where they err is in their selected model against which diminishment is to be measured. Plaintiffs focus on preserving intact the black geographical cluster in northern and central Jackson and would have us determine diminishment by inquiring merely whether the proposed district lines divide it. But of course they do. Any likely division of the county would do so except one drawn on racial lines with the purpose of securing safe "black" or "white" seats on the board of supervisors. Plaintiffs' focus is too narrow, their approach too mechanical, at this stage of the inquiry. There being no intended gerrymander, the proper present focus of inquiry is not a map area [19] but the voting power of the entire black populace of Hinds County, and the model against which its claimed diminishment must be measured is, as indicated above, the number of seats on the board proportionate to that population's percentage of the whole.

So tested, the conclusion of the district court stands firm that

the black voting strength in Hinds County is not minimized or cancelled out by the 1973 Board plan, but on the contrary, the Board plan offers black residents of Hinds County, who constitute less than 40% of the total population thereof, a realistic opportunity to elect officials of their choice, whether they be white or black, in two supervi-

---

**19.** Of course, the unusual shapes of the proposed districts are important. But the shapes are chiefly relevant to the question of whether the plan is a racial gerrymander. Once we accept the district court's unchallenged findings that the plan was drawn without reference to race and that the districts reasonably follow natural boundaries, *see* p. 538 *supra,*

the significance of the geographic shapes is almost exhausted. They may, for example, indicate nothing more than a *political* gerrymander, an inhabitant of the thicket at present out of season to courts. *See Jimenez v. Hidalgo County Water Imp. Dist. No. 2,* 68 F.R.D. 668, 672–75 (S.D.Tex.1975).

sor's districts and significantly affect the election of county officials in the three remaining supervisors' districts . . . .[20]

 In so holding, we are especially mindful of the unusual deference our court has been accustomed to accord the trial court's local perspective in such matters[21] and of the results and general course of reasoning in our factually similar recent cases of *Gilbert v. Sterrett,* quoted *supra, Robinson v. Commissioner's Court, supra* note 21, *Moore v. Leflore County Board,* 502 F.2d 621 (5th Cir. 1974), and *Howard v. Adams County Board,* 453 F.2d 455 (5th Cir. 1972). Finally, we caution drafters of redistricting plans against the temptation to deliberate division along racial lines, geographic or proportional. This is not what we here approve. What we do approve is the preparation of plans honestly devised on nonracial and rational criteria that, when tested against proportional norms, deny to no group an equal access to the political process or a fair chance to realize its full voting potential—even one based on the irrelevant criterion of race.

Plaintiffs not having prevailed, they are not entitled to attorneys' fees. *See Sapp v. Renfroe,* 511 F.2d 172, 178 (5th Cir. 1975).

Affirmed.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, WISDOM, GEWIN, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE and TJOFLAT, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

---

**20.** This is not to say that other arrangements giving fair effect to a 35% share of the electoral power might not be equally acceptable. As we noted in *Turner v. McKeithen,* 490 F.2d 191, 197 n. 24 (5th Cir. 1973):

There is no agreement on whether the political interests of a minority group are best maximized by an overwhelming majority in a single district, bare majorities in more than one district or a substantial proportion of the voters in a number of districts. See,

e. g., *Wright v. Rockefeller,* 1964, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512.

**21.** *Robinson v. Commissioner's Court,* 505 F.2d 674, 679 (1974); cf. *White v. Regester,* 412 U.S. 755, 769; 93 S.Ct. 2332, 2341; 37 L.Ed.2d 314, 326 (1973).