468 F.Supp. 285 (1979)
Henry J. KIRKSEY, George W. Daniel, Bennie G. Thompson, Individually and on behalf of all others similarly situated, Plaintiffs,
v.
BOARD OF SUPERVISORS OF HINDS COUNTY, MISSISSIPPI, Election Commission of Hinds County, Mississippi, and Democratic Executive Committee of Hinds County, Mississippi, Defendants.
Civ. A. No. 4939(N).
United States District Court, S. D. Mississippi, Jackson Division.
March 22, 1979.
*286 *287 Frank R. Parker, Barbara Y. Phillips, Jackson, Miss., for plaintiffs.
W. F. Goodman, Jr., Velia Ann Mayer, Jackson, Miss., Russel D. Moore, III, Jackson, Miss., for defendants.

MEMORANDUM OPINION
NIXON, District Judge.
The present duty of this Court is to write the latest chapter in the decade long struggle to devise constitutional districts in Hinds County, Mississippi for the election of members of the Board of Supervisors, the county governing body. This task is one in which we have invested an immense amount of conscientious effort to reach a constitutional and equitable solution to this difficult problem, but so far to no avail. Our initial determination of this action is set out in Kirksey v. Board of Supervisors of Hinds County, 402 F.Supp. 658 (S.D.Miss. 1975), wherein we approved the plan proposed by the Board of Supervisors for reasons set forth therein. On appeal, this result passed muster before a panel of the Court of Appeals in an opinion reported at 528 F.2d 536 (5th Cir. 1976), but was condemned and rejected by the en banc Court of Appeals on both constitutional and non-constitutional grounds, and was remanded for another attempt at fashioning a remedy. See Kirksey v. Board of Supervisors of Hinds County, 554 F.2d 139 (5th Cir. 1977) (en banc). So it is to this chore we now turn.
The three opinions noted above detail the history of this litigation in exhaustive depth, and therefore no further elaboration is warranted. After receiving the en banc court's mandate, we entered an Order on January 5, 1978, directing the parties to file new proposed court-ordered county redistricting plans which would conform to the dictates of the appellate court. Subsequently, this Court conducted a hearing to permit the parties to present their new proposed redistricting plans. Based upon the evidence produced at the post-remand hearing, the case is now ripe for adjudication.

Our Duty on Remand
The discussion of this topic can be simplistically summarized by noting that the Court's duty at this point is to devise and implement a constitutional plan for the election of the Board of Supervisors of Hinds County. However, we are obligated to look at the en banc opinion for guidance in this task, since it contains the last word of the Court of Appeals in this case. Yet whatever careful examination of the directives contained therein will reveal, the difficulties will still remain which were succinctly recognized by the panel of the Court of Appeals when they observed:
One who would offer to a district court a suggested electoral redistricting of such *288 a county as Hinds must walk a narrow line. To begin with, the physical situation presented is inherently difficult: a rural county containing one significant metropolis, which itself encompasses a racial enclave, and a black population that must not be "`designedly or otherwise'" treated so as to minimize its voting strength. Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 1294, 16 L.Ed.2d 376, 388 (1966) (emphasis added), quoting Fortson v. Dorsey, 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401, 405 (1965). On the other hand, the minority "`is not constitutionally entitled to an apportionment structure designed to maximize its political advantage.'" (footnote omitted) And so it appears the designer's lines should be drawn so as to avoid favoring and must be drawn so as not to disfavor the minority group of which the internal racial bloc is a part. Perhaps it would be prudent, he may reflect, to draw no lines at all, since their location is such a ticklish matter. But this option is all but eliminated by Connor v. Johnson, 402 U.S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971), and its holding that multi-member districts are not favored in court-ordered plans. Lines must usually be drawn, it seems; and, at least where election districts for county supervisors are concerned, practical considerations urge that they be drawn so as to include proportionate urban and rural areas within each district, since the supervisors' duties are, while perhaps primarily rural-oriented, far from exclusively so. Finally, of course, under Avery [390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45] the districts must contain about the same number of people. A task indeed! One which, with the addition of only a tincture of malice or exasperation to the cloud of seemingly overlapping negatives set out above, can be cast as impossible.
528 F.2d at 540-541 (footnotes omitted). As if these difficulties weren't enough, we must consider the impact of United Jewish Organizations of Williamsburgh, Inc. v. Carey, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) on the parameters discussed above, a decision which influenced one Judge on the panel who wrote the panel's unanimous opinion affirming this Court, to later concur in the en banc court's opinion.
The en banc court began by reviewing the history and the figures involved in redistricting Hinds County, and noted that we had concluded that the plaintiffs had failed to meet the burden of proving that the new district boundaries were drawn by or for the defendants on racial lines or of proving that the defendants or the draftsman of the plan considered race in any manner. The court then stated that a redistricting plan might be rendered unconstitutional as racially discriminatory if it were a racially motivated gerrymander or if the plan perpetuated an existent denial of access by the racial minority to the electoral process. 554 F.2d at 142. The court rejected our finding that the plaintiffs had failed to prove that the lack of access reflected in Hinds County's past history was indicative of the present situation in this regard, and held:
Once plaintiffs established a past record of racial discrimination and official unresponsiveness which required the conclusion that at least until a short number of years past they had been denied equal access to the political processes of the county, it then fell to the defendants to come forward with evidence that enough incidents of the past had been removed, and the effects of past denial of access dissipated, that there was presently equality of access.
554 F.2d at 144-145.
The en banc court felt that we were in error in requiring the plaintiffs to prove that the factors viewed to be indicative of lack of access actually produced that result, but rather that it was an inference which flowed from the existence of economic and educational inequalities. In addition, the court considered the evidence indicative of present equality of access produced at the first trial of this case as insufficient to support such a finding. As a final constitutional error in the defendants' previous plan, the en banc court found that implementation of the plan would have the effect *289 of perpetuating denial of access by fragmenting a geographically concentrated minority voting community in the context of bloc voting, which tended to dilute the voting strength of the minority, and thus deprived them of a realistic chance to elect supervisors of their choice.
Consequently, the case was remanded to this Court for the fashioning of a constitutional remedy which conforms to all constitutional requirements and legitimate planning objectives. One concurring member of the majority of the en banc court gauged this task as follows:
Thus, the opinion of the en banc court, indirectly but unmistakenly commanding the trial court to devise and install a more partisan gerrymander in favor of Hinds County black voters so as to guarantee their proportionate representation on the county board, seems to be both required and appropriate.
554 F.2d at 155.
However in United States v. Board of Supervisors of Forrest County, 571 F.2d 951 (5th Cir. 1978) (hereinafter cited as Forrest County), the court stated that the en banc opinion in Kirksey did not "expressly require the creation of a district that has a majority of registered voters who are black." 571 F.2d at 955. Therefore the proposition that United Jewish Organizations, supra, requires this configuration can be eliminated from the list of requirements the en banc court would give this Court to incorporate in the new remedial plan.
The same reasoning must be directed toward the necessity of utilizing long corridors running into the center of the City of Jackson from the rural land mass of the county in order to achieve the required equalization of population and realize the other desirable planning objectives of equalization of road and bridge maintenance responsibilities and the substantial equalization of land areas between the districts. The en banc opinion cannot be read as rejecting any utilization of such an arrangement, although it condemned this Court's earlier attempt to redistrict Hinds County in this manner because the en banc court found that plan would dilute the voting strength of the minority. We reach this conclusion for several reasons. In Forrest County, supra, a case decided subsequent to the reversal of the case sub judice, the Court of Appeals was faced with a situation where, like Hinds County, the black population of the county was concentrated in an urban area. In addressing that fact, the court stated, as has been noted above, that the en banc court in Kirksey did not expressly require that districts be created containing majorities of black voters of such extent to guarantee the election of black candidates. In addition, the court in Forrest County admitted that some division of the urban concentration of blacks in the county would have to occur in drawing up the new supervisors' districts in order to achieve population equalization. Even though supervisors' districts could be constructed entirely within the City of Jackson, the only redistricting objective this would satisfy would be population equalization, other than to insure the election of black candidates. Such an arrangement would be entirely inconsistent with the application of Kirksey detailed by the court in Forrest County, both in letter and in spirit. Additionally, the "spoke-like" plan was used by this Court in Adams County, and the plan passed constitutional muster. Howard v. Adams County Board of Supervisors, 453 F.2d 455 (5th Cir. 1972), cert. denied, 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972).
By the same token, a plan which had as its chief requirement the preservation of black concentrations in the inner city would abdicate the traditional responsibilities of the supervisors in those districts, and create positions that are largely symbolic. The court in Forrest County noted that the activities of supervisors "are devoted primarily to county affairs" and are of "little concern" to urban residents, and the Court cannot conceive that the Court of Appeals favored creation of political offices whose activities are of "little concern" to the black citizen as a means of increasing black access to the political process.
*290 Supervisors' districts entirely within the city limits would also disregard considerations of equalizing road and bridge maintenance responsibilities, and of course would render impossible any sort of equalization of land mass area within the district. Although the en banc court stated these factors "must be subordinated to the constitutional interests at stake," 554 F.2d at 151, the court in Howard v. Adams County Board of Supervisors, supra, noted that these considerations were "legitimate planning objectives," and in Moore v. Leflore County Board of Election Commissioners, 502 F.2d 621, 625 (5th Cir. 1974), the court called these factors "extremely important." Therefore, we understand the en banc court to have instructed us to give these items only their proper weight, and not to eliminate them from our consideration in drawing a redistricting plan. All these conclusions lead us to the result that the objection of the en banc court was not aimed at division of the black population of Jackson per se, but at the manner in which the old plan brought this division about. The Court is obviously not alone in this interpretation, since the defendants' proposed plan, and two out of the three plans the plaintiffs originally proposed, include long corridors running into the city.

Minority Access to the Political Process in Hinds County Today
As noted above, a redistricting plan is unconstitutional if it perpetuates an existent denial of access by the racial minority to the political process. The appellate court discussed the problem of determining access as follows:
We noted in Zimmer, 485 F.2d [1297] at 1305, that the Supreme Court in White v. Regester, had identified several factors indicative of denial of access to the political process. Among these are: a history of official racial discrimination which touched the right of the minority to register and vote and to participate in the democratic process, 412 U.S. [755] at 766, 93 S.Ct. 2332, 37 L.Ed.2d [314] at 325; a historical pattern of a disproportionately low number of minority group members being elected to the legislative body, id.; a lack of responsiveness on the part of elected officials to the needs of the minority community, 412 U.S. at 769, 93 S.Ct. 2332, 37 L.Ed.2d at 325-326; a depressed socioeconomic status which makes participation in community processes difficult, 412 U.S. at 768, 93 S.Ct. 2332, 37 L.Ed.2d at 325-326; and rules requiring a majority vote as a prerequisite to nomination, 412 U.S. at 766, 93 S.Ct. 2332, 37 L.Ed.2d at 324. While these standards were developed for use in situations involving multimember districts, they have equal application to redistricting schemes making use of single-member districts, such as the plan presently before this court. Robinson v. Commissioners Court, 505 F.2d 674, at 678 (CA 5, 1974); Howard v. Adams County Board of Supervisors, 453 F.2d 455, at 458 n.2 (CA 5), cert. denied 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972). By proof of an aggregation of at least some of these factors, or similar ones, a plaintiff can demonstrate that the members of the particular group in question are being denied access.
554 F.2d at 143.
The Court went on to hold that the plaintiffs had produced evidence of past racial discrimination and of official unresponsiveness to the needs of blacks in Hinds County, and thus the defendants had the burden of coming forward and proving present equality of access which it was found they had failed to do.
At the rehearing of this case, in compliance with the Fifth Circuits' newly announced burden, the defendants produced extensive evidence concerning the status of the black population's access to the political process in Hinds County today. One of these witnesses, William E. McKinley, the Circuit Clerk of Hinds County since 1972, testified that his office encouraged voter registration by every potential voter, primarily through the support of voter registration drives. According to McKinley, there is always some type of voter registration drive being conducted by a school, a *291 civic club or a radio or television station. Mr. McKinley's office furnishes the forms to the people putting on the drive, and makes arrangements for groups to register at one time. In addition, the Circuit Clerk's office is kept open on Saturdays until noon to accommodate the people who have to work during the week and who are discouraged from registering by the parking problem downtown, and upon request the office is often kept open until after 5 p. m., the normal closing time. All of these factors indicate the positive attitude the Circuit Clerk's office has toward the goal of getting all eligible voters registered and thus qualified to participate in the political process.
McKinley testified that there were absolutely no barriers of any kind to prevent or discourage black citizens from registering to vote in Hinds County. In fact, in order to encourage black registration and make blacks feel more comfortable in the registration process, the clerk had a black employee assisting in registering voters. The Circuit Clerk's office has had three black employees, but the last one left as of January 15, 1979 and moved to the coast to get married. Mr. McKinley is actively searching for another black employee to assist in handling voter registration. This Court is convinced that the Circuit Clerk's office is doing everything possible to encourage voter registration by all eligible voters, regardless of race, and in fact is "going the extra mile" to encourage black citizens to register and vote. Furthermore, the Court is convinced by Mr. McKinley's testimony that black candidates must only satisfy the same prerequisites for running for office as white candidates, and that the political process from this aspect is equally open to whites and blacks.
The present record reflects that currently in Hinds County there is no denial to black citizens of full and complete access to the political process.
The Court was impressed with the testimony of Ms. Kathryn Hester, an expert political and economic analyst for the Economic Forecast Division of the Mississippi Research and Development Center for almost seven years, and a life-long resident of the City of Jackson. This witness was an observer of the political processes and the manner in which government effects its constituents and had done research for several years in Jackson and Hinds County. Ms. Hester worked in precinct analysis in a 1972 bond issue election, trying to predict the turnout in each precinct, and performed an analysis of every precinct in Mississippi for a candidate making a state-wide race in 1975. She has done various kinds of economic and fiscal analysis for numerous branches of state government, including the Budget Commission, and for the past four years has prepared the fiscal summary of Mississippi for the legislature. Ms. Hester is a Fellow of the Institute of Politics and has lectured for the past four years at a political science seminar at Millsaps College in Jackson, and is a member of the Chimneyville Society, an organization in Jackson which was formed to study educational, governmental and ecological problems in the city and formulate methods to motivate the public to action to solve these problems. The witness has studied city government, especially the mayor-council form of government, and was instrumental in promoting legislation to permit cities in Mississippi to move to this form of government. In addition to being active in political campaigns herself, the witness has worked extensively with election records, the role of the media in campaigns, and has observed the participation and lack of participation of the black population as voters and candidates.
With this extensive and impressive background in this area, the witness undertook a study on the question of whether, given the past history of discrimination in Hinds County, there are presently any barriers in the political process which would give black citizens less than equal access. She spent a great deal of time on the project, devoting the greater amount of her research to the last ten years, but also including the pre-1965 era in her research, including the participation of blacks in the political process as campaign workers, voters and candidates.
*292 In this latter context, blacks have gone from a condition where there were no black candidates, to the setting of 1975, when there were blacks running for office as Democrats, Republicans and Independents. The present time has seen black candidates for every major political office in Hinds County as well as state-wide, also at the municipal level.
A study of the media exposure given the various candidates revealed that black candidates are given equal, if not preferential treatment in the publicity accorded their campaigns. For instance, Ms. Hester searched the Clarion Ledgar, the Jackson Daily News, and the Capitol Reporter, three leading newspapers in the Hinds County area, for articles dealing with last year's Senate and Congressional races and found 397 articles dealing with these elections. One hundred and seventy-nine of these articles mentioned all of the candidates, sixty mentioned the white Democratic candidate only, thirty-nine mentioned the white Republican only, forty-eight dealt exclusively with the leading black candidate, Charles Evers, and seventeen dealt with the plaintiff in this case, Henry Kirksey. In the race for Congressman from the district including Hinds County, ten articles dealt with the black independent candidate Evan Doss, ten articles dealt exclusively with the white Democratic candidate, and nine articles dealt with the white Republican candidate. These figures make it readily apparent that black candidates received equal or better newspaper coverage of their campaigns then did white candidates. While this fact does not in itself prove equality of access to the political process, it does indicate that not only are black candidates able to run for public office and participate in the political process without hindrance, but are given serious and important consideration in their efforts by this form of the media, which is indispensable to effective participation in the political process.
Examination of the National Roster of Black Elected Officials as of 1978 revealed over 308 black elected officials in Mississippi. There were 4 state representatives, 38 county officers, 145 municipal officers, 55 justices of the peace, constables and court officers, and 62 members of school boards and 4 superintendents of education. Ms. Hester was also able to give the figures for Hinds County as of 1978, and these included 3 successful candidates for state representative, 2 mayors in the county, 9 members of city councils, 2 black judges in the county, and 2 members of school boards in the county. Significantly, the number increases with each election.
Ms. Hester examined many elections in which blacks had run, and found numerous cases in which blacks had supported white candidates, and where black candidates had received white support, and concluded that blacks do not necessarily support black candidates only. A prominent example of this was found recently when a black representative from Hinds County supported the white Democratic candidate for the U. S. House of Representatives instead of the black Independent candidate. Also, Rep. Horace Buckley, a black representative from Hinds County, supported a white candidate. Ms. Hester was able to say that there was no universal rule that blacks support black candidates only, that there were numerous instances of interracial voting in the city and the county, and that the support the candidate received from the white and black community varied with who the candidate was, the office sought and who the candidate's opponent was.
The results of her study convinced Ms. Hester that there was equal access for blacks and whites to the political process in Hinds County today, both as candidates and voters. As a practical matter, she stated that the best way to get elected was of course to run unopposed, but if this were not the case then a candidate's campaign expertise, experience, financial support, the ability to get people out and involved in the campaign, plus the talent of selling one's personality to the voters were the factors involved in getting elected, according to Ms. Hester, and the candidate who was successful in coordinating all of these was the candidate whose chance for election was best, regardless of his race. However, this *293 witness did not hesitate in declaring that no candidate, whether white or black, could get elected in Hinds County without substantial black support. Therefore any candidate or incumbent seeking reelection ignored the black community at his or her peril, and this fact acted as insurance that candidates must be responsive to the needs of the black community, as well as the needs of the community as a whole. With the realities of getting elected in this posture, white officeholders are not in a position to ignore the governmental needs of their black constituents.
The en banc court stated that the plaintiffs had produced evidence of past discrimination and official unresponsiveness which required the conclusion that "at least until a short number of years past" blacks did not have equal access to the political process, and thus the defendants had the burden of proving that these "incidents of the past had been removed," as well as their effects, and that there was presently equality of access. What are these incidents of the past the en banc court found so pervasive? The first fact was that no black had ever been elected to Hinds County office. Clearly this is not the case at the present, in light of the successful black candidates described by Ms. Hester above. The plaintiffs of course attack the number of black elected officials as inadequate, but if the absence of these electoral successes was probative in proving lack of access, as the en banc court said it was, then the presence of these successful black candidates must also be accorded some significance and probative value. The value placed by the Court herein is that the fact blacks are successful in being elected in Hinds County today is indicative of access to the political process. In addition, when the plaintiffs seek to lessen the probative value of the election of black candidates in Hinds County by claiming the number of these officeholders is too small to be significant, the Court is convinced they are confusing access with success, and the Court's duty is to insure the former, while no court can guarantee the latter.
The plaintiffs also seek to disparage the significance of black electoral victories by claiming they are only possible where black voters heavily predominate. The Court declines to accept this reasoning, for reasons which will be outlined in more detail below, but in any event the logical result of this thinking would be to create a constitutional requirement for black enclaves, an idea the courts have repeatedly condemned. A state or local government is under no obligation to provide any minority, racial or otherwise, with representation proportionate to their voting power. See, e. g., White v. Regester, 412 U.S. 755, 765-66, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Whitcomb v. Chavis, 403 U.S. 124, 152, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).
There is evidence of bloc voting along racial lines in Hinds County, but this by itself is no constitutional infirmity. Ms. Hester noted instances since the original trial of this cause when this rule had not held true. As the court said in Marshall v. Edwards, 582 F.2d 927 (5th Cir. 1978), in discussing a political body which had been subject to racial bloc voting in the past:
The plan further assume[s] that the racial groups would vote only for members of their own race. The findings made earlier in this case that East Carroll Parish has a history of racial bloc voting does not necessarily mean that the blocs would be solid if an exceptionally popular and well qualified candidate of one race ran against an exceptionally unpopular and unqualified candidate of another race.
582 F.2d at 934, fn. 8.
In the same light, poll taxes, literacy tests, segregation principles espoused by political parties, and property ownership requirements to run for political office are all elements of the past. Our previous opinion in this case, 402 F.Supp. at 670-673, discussed these factors. The en banc court stated that these factors would "not bear the weight" (554 F.2d at 145) we put on them, but it did not say that these factors were totally without any probative value, and wouldn't bear any weight at all. When combined with the convincing testimony of *294 Ms. Hester, the Court is convinced that the defendants have met their burden of proof in this regard. The Court finds as a fact that there is presently equality of access to the political process in Hinds County and that enough of the residual effects of the mistakes of the past have been dissipated to allow this present equality of access.
This important conclusion is amply supported by the facts in the record of this case. Blacks serve on juries in large numbers, as this Court can observe in its own operation. Ms. Hester testified that large numbers of black candidates have run for office, and increasing numbers are successful, and in light of the new redistricting plan for county supervisors, which the Court will implement below, there is every likelihood that blacks will be able to elect blacks to the county board of supervisors, if the candidate of their choice be black. The dual school system has long been dismantled, and recent studies have noted that there is more integration in the public schools of this area of the nation than in any other.
The United States Supreme Court stated in the case of White v. Regester, supra, with respect to whether blacks in the area in question are denied full and effective access to the political process:
The plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question  that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice.
412 U.S. at 766, 93 S.Ct. at 2339.
Although the en banc court found that the plaintiffs had met this burden at the original trial of this case in 1975, and that the defendants had not rebutted this evidence, several conditions have changed in the interim. For one thing, four additional years have passed since the original trial of this case, years in which blacks have made much progress in Hinds County, educationally, economically and politically. The witness Hester did a study of the median number of school years completed by the population of Hinds and Rankin Counties, based on data contained in the 1970 census. She found that for all people, 25 years or older, the median education level was 12.2 years, but for blacks it was 8.6 years. However, for people in the 20-24 years old bracket, overall the average number of years of education was 12.8 and for blacks it was 12.4. Clearly then, the educational level difference between blacks and whites is narrowing. Unquestionably, each election sees increasing numbers of black candidates running and winning, and blacks are more active in every level of politics. The lead plaintiff in this case, Henry Kirksey, is a perennial candidate, although his efforts have not so far been blessed with success. The Court can take judicial notice of the increasing level of participation by blacks in politics in the City of Jackson which we alluded to in our Memorandum Opinion in Kirksey v. City of Jackson, Mississippi, 461 F.Supp. 1282 (S.D.Miss.1978) (appeal pending).
Another consideration is that in the original trial of this case the defendants were not aware that they had the burden of proving present equality of access to the political process in Hinds County and the duty of showing that the past racial discrimination is no part of the present. It is a matter of conjecture whether the defendants could have met the burden at that time. However, in this hearing the defendants were aware of their burden and produced sufficient evidence which this Court, as the finder of fact, deems sufficient to establish present equality of access.

The Plans
Pursuant to this Court's Order of January 5, 1978, the parties filed proposed court-ordered county redistricting plans which were prepared under the Court's directive that the plans contain approximately equal population and not minimize or cancel out black voting strength. The defendants *295 have filed a plan prepared by Comprehensive Planners, Inc., a firm which has extensive training and experience in this area, having prepared numerous plans for use in federal court cases, with only the plan previously submitted by the defendants in this case failing to pass a court's scrutiny of its constitutional muster. The witness who prepared this plan, Hoyt T. Holland, had developed redistricting plans for 37 Mississippi counties, 4 Alabama counties, and 3 cities and the Court recognized this witness as eminently qualified as an expert in the field of redistricting, as have other courts. The plaintiffs did not call an expert in the field of redistricting, although they sought to qualify two of their witnesses as such without success.
The plaintiffs filed three proposed redistricting plans, Plans A, B, and C, which were prepared by Dr. Gordon G. Henderson, a Professor of Political Science at Tougaloo College, with assistance from the plaintiff Henry Kirksey and counsel for the plaintiffs, Frank Parker. The status of plaintiffs' proposed Plan A is somewhat in limbo, as will be detailed below.
The population and racial composition of the defendants' proposed supervisor districts are shown below. The Court accepts the defendants' statistics as accurate and will use them in this Opinion.

 Total Per Cent White Per Cent Nonwhite Per Cent
Dist. Pop. Variance Pop. White Pop. Nonwhite
 1 42,220 - 1.80% 37,574 89.0% 4,646 11.0%
 2 43,143 + 0.35% 12,120 28.1% 31,023 71.9%
 3 43,081 + 0.20% 35,823 83.2% 7,258 16.8%
 4 43,010 + 0.04% 29,274 68.1% 13,736 31.9%
 5 43,519 + 1.22% 15,801 36.3% 27,718 63.7%
 _______ _______ _______
 214,973 130,592 84,381

The total deviation from absolute population equality under this plan is 3.02%, which is calculated by adding the two extreme variations, below and above the ideal. Thus -1.80% is added to + 1.22% to yield the total deviation of 3.02%.
However, we were admonished by the en banc court to pay closer attention to the voting-age population (VAP) of each district. The estimated voting age population of each of the defendants' proposed districts, indicated by race, is contained in the table below:

 Total White Per Cent Nonwhite Per Cent
Dist. VAP VAP White VAP VAP Nonwhite VAP
 1 25,933 23,727 91.5% 2,206 8.5%
 2 24,545 8,189 33.4% 16,356 66.6%
 3 26,901 22,942 85.3% 3,959 14.7%
 4 28,409 21,088 74.2% 7,321 25.8%
 5 29,255 12,890 44.1% 16,365 55.9%
 _______ ______ ______
 135,043 88,836 46,207

Voter registration figures by race are only available for the City of Jackson, and not for the county as a whole, and therefore the defendants did not include estimates of voter registration figures for each of their proposed districts in their plan. However, the court has stated that voting age population figures (VAP), rather than voter registration statistics, are important in assessing the constitutionality of a reapportionment plan. Marshall v. Edwards, 582 F.2d at 937 fn. 10. The Supreme Court of the United *296 States has stated that allowing voter registration statistics to influence reapportionment plans has the potential for constitutional error. Burns v. Richardson, 384 U.S. 73, 92-93, 86 S.Ct. 1286, 1296-97, 16 L.Ed.2d 376 (footnote and citations omitted).
The population and racial composition of the population of the plaintiffs' proposed districts in Plans A, B, and C are as follows, including the figures for voting-age population:

 Plan A
 Total Per Cent White Per Cent Nonwhite Per Cent
Dist. Pop. Variance Pop. White Pop. Nonwhite
 1 43,124 + 0.30 38,564 89.4% 4,560 10.6%
 2 42,885 - 0.25 11,798 27.5% 31,087 72.5%
 3 42,985 - 0.02 29,834 69.4% 13,151 30.6%
 4 42,582 - 0.96 33,921 79.7% 8,661 20.3%
 5 43,397 + 0.94 16,511 38.0% 26,886 62.0%
 _______ _______ ______
 214,973 130,628 84,345

The total deviation under this plan is 1.90%, which is calculated by adding the -0.96 deviation and the + 0.94 deviation.

 Plan A
 (continued)
 Total White Per Cent Nonwhite Per Cent
Dist. VAP VAP White VAP VAP Nonwhite VAP
 1 26,674 24,501 91.9% 2,173 8.1%
 2 24,331 7,963 32.7% 16,368 67.3%
 3 27,249 19,148 70.3% 8,101 29.7%
 4 28,264 23,907 84.6% 4,357 15.4%
 5 28,428 13,253 46.6% 15,175 53.4%
 _______ ______ ______
 134,946 88,772 46,174

 Plan B
 Total Per Cent White Per Cent Nonwhite Per Cent
Dist. Pop. Variance Pop. White Pop. Nonwhite
 1 42,884 - 0.26% 38,430 89.6% 4,454 10.4%
 2 42,654 - 0.79% 11,450 26.8% 31,204 73.2%
 3 43,560 + 1.31% 32,511 74.6% 11,049 25.4%
 4 42,299 - 1.62% 33,707 79.7% 8,592 20.3%
 5 43,576 + 1.35% 14,530 33.3% 29,046 66.7%
 _______ _______ ______
 214,973 130,628 84,345

The total deviation under this plan is 2.97%, which is calculated by adding the -1.62 deviation and the + 1.35 deviation.

*297
 Plan B
 (continued)
 Total White Per Cent Nonwhite Per Cent
Dist. VAP VAP White VAP VAP Nonwhite VAP
 1 26,738 24,634 92.1% 2,104 7.9%
 2 24,952 8,515 34.1% 16,437 65.9%
 3 27,210 20,661 75.9% 6,549 24.1%
 4 28,087 23,760 84.6% 4,327 15.4%
 5 27,959 11,202 40.1% 16,757 59.9%
 _______ ______ ______
 134,946 88,772 46,174

The figures for Plaintiffs' Proposed Plan C are outlined in the charts below:

 Plan C
 Total Per Cent White Per Cent Nonwhite Per Cent
Dist. Pop. Variance Pop. White Pop. Nonwhite
 1 42,104 - 2.07% 39,995 95.0% 2,109 5.0%
 2 43,447 + 1.05% 11,672 26.9% 31,775 73.1%
 3 42,005 - 2.30% 29,447 70.1% 12,558 29.9%
 4 43,473 + 1.11% 11,792 27.1% 31,681 72.9%
 5 43,944 + 2.21% 37,722 85.8% 6,222 14.2%
 _______ _______ ______
 214,973 130,628 84,345

The total deviation under this plan is 4.51%, which is calculated by adding the -2.30% deviation and the + 2.21 deviation.

 Plan C
 (continued)
 Total White Per Cent Nonwhite Per Cent
Dist. VAP VAP White VAP VAP Nonwhite VAP
 1 28,643 27,490 96.0% 1,153 4.0%
 2 28,217 9,345 33.1% 18,872 66.9%
 3 26,558 20,151 75.8% 6,437 24.2%
 4 24,050 7,603 31.6% 16,447 68.4%
 5 27,448 24,183 88.1% 3,265 11.9%
 _______ ______ ______
 134,946 88,772 46,174

The various exhibits admitted into evidence outline the specifies of each plan in great detail. Plaintiffs' Proposed Plan A was abandoned by them at the retrial of this cause, and, although the circumstances surrounding the submission and withdrawal thereof will be examined in detail below, this plan is no longer being considered by the Court as one of the plaintiffs' proposed plans. The plaintiffs object that the defendants' plan dilutes and minimizes black voting strength by its method of division of the black population concentration in the City of Jackson, especially in the defendants' proposed District 5. The plaintiffs also contend that the defendants' proposed plan unnecessarily fractures existing voting precincts in the city. The defendants have objected to the plaintiffs' proposed plans on the grounds that they are arbitrary and *298 exaggerated racial manipulations for the purpose of producing safe black election districts, and that they constitute racial gerrymanders.
As this Court has previously found, according to the 1970 Census, Hinds County has 214,973 residents, of whom 130,592 (60.75%) are white, and 84,064 (39.10%) are black, with 317 (0.15%) of other races. See 402 F.Supp. at 662-63. The black population of Hinds County is concentrated in the center of Jackson, containing 58,198 black persons, or 69% of the total black population of Hinds County.
The evidence produced at the retrial of this cause centered around the differences in the various proposed District 5s. Each proposed plan contained one other heavily black district, and this fact prompted the lead plaintiff, Mr. Kirksey, to testify that he had no objection to the defendants' proposed District 2. However, he did object to the defendants' proposed District 5 on the ground that it diluted the black voting strength in that district, and denied the black voters the chance to elect a representative of their choice. Kirksey said that the level of black registration and turnout was low, that blacks weren't registered in the numbers that the whites were, that blacks were aware of bloc voting and therefore had a feeling that it was futile to hope for victory in a black versus white election. Kirksey said he had studied the socio-economic characteristics of Precincts 8 and 9, included in the Belhaven area of Jackson which is in defendants proposed District 5, and found it to be among the highest in Hinds County. Kirksey said Precincts 8 and 9 had an exceptionally high level of political participation and should not be included with inner city precincts for that reason.
Dr. Gordon Henderson also called the defendants' proposed plan a racial gerrymander, stating that the defendants had manipulated the precinct boundaries unnecessarily and had dispersed the black population.
The composition of District 5 under the various proposed plans is summarized below, in terms of percentages:

 Proposed District 5
 White Nonwhite White Nonwhite
Plan Pop. Pop. VAP VAP 
Defendants' 36.3% 63.7% 44.1% 55.9%
Plan A 38.0% 62.0% 46.6% 53.4%
Plan B 33.3% 66.7% 40.1% 59.9%

Plan C is not included here because of its different districts. As can be seen, the District 5 difference in black voting age population in defendants' plan and plaintiffs' plan B is only 4.0 percentage points.
The Court is the judge of the credibility of the witnesses, determines the weight to be given their testimony, and makes the ultimate finding of facts. It is the district court's duty to determine which plan will implement effective black participation in the future political processes of Hinds County. Forrest County, supra, at 956. Conscientious exercise of these duties compels the Court to give little credence to the testimony of the witness Kirksey, for reasons which will be outlined below.
We declined to recognize Mr. Kirksey as an expert in the field of redistricting, although he has tried on several occasions to qualify himself as such before this Court. As we noted recently in our Memorandum Opinion in the case of Canton Branch of N.A.A.C.P. v. City of Canton, (S.D.Miss. 1979), of which we take judicial notice, the only qualifications this witness possesses in this field are his college degree in economics and his World War II field artillery experience. This is not sufficient, in the Court's opinion, to qualify this witness as an expert in redistricting. Despite our specific refusal to recognize this witness as an expert in the field of redistricting *299 at the original hearing in this cause, he testified before the United States District Court for the District of Columbia that he had been recognized or accepted by this Court as an expert in that field in the original trial of this case.
Mr. Kirksey, Dr. Henderson and Mr. Parker were all involved, and had varying amounts of input into all three of the plaintiffs' proposed plans. Mr. Kirksey did not work with Dr. Henderson in drawing plaintiffs' proposed plans A and B, but only worked with Dr. Henderson on plaintiffs' proposed plan C, although Kirksey drew the district lines on the maps of all three districts. Since Mr. Kirksey actually devised Plan C, it was his preference, and in fact he stated that Plan C was, as he described it, what redistricting should be. This of course is the plan which contains two proposed supervisor's districts entirely within the city limits of Jackson.
The charts reproduced in this Opinion show that Plan C divides the population along racial lines in such a manner that each district contains at least 70% population of one race, and the two districts it creates entirely within the city are both overwhelmingly black. Since the supervisors in these districts would have few of the traditional responsibilities of county supervisors, giving the other three supervisors the burden of substantially all the duties and responsibilities of meeting the governmental needs of the rural population of the county, the only justification for such an arrangement is to insure that the black voters of those districts, assuming they all voted for the same candidate and that he was black, would be certain to elect a black supervisor. Plan C obviously ignores all the traditional practical aspects of the supervisor's duties, but this is not surprising in light of the fact Kirksey stated he objected to the use of considerations of equalization of land area and road and bridge maintenance in drawing redistricting plans for supervisors' districts. According to Mr. Kirksey, the only significant factor in drawing a supervisor's district, other than avoiding dilution of black voting strength, was equalization of population, and all of the other traditional factors the courts have recognized were merely "administrative considerations."
A gerrymander is a division of an area into political units to give special advantage to one group, so Plan C is not only an obvious, blatant racial gerrymander, but it also ignores every recognized county redistricting criteria other than those Kirksey mentioned. If there is one concrete principal in this area, it's that blatant racial gerrymanders are unconstitutional, and in addition "a minority group is not constitutionally entitled to an apportionment structure designed to maximize its political advantage." Gilbert v. Sterrett, 509 F.2d 1389, 1394 (5th Cir. 1975), quoting Turner v. McKeithen, 490 F.2d 191, 197 (5th Cir. 1973). See generally, Whitcomb v. Chavis, supra. The court's approval of the use of racial criteria in redistricting in United Jewish Organizations, supra, did not extend to obvious racial gerrymanders designed to insure proportional racial representation. See Forrest County, supra at 955. White v. Regester, supra; Whitcomb v. Chavis, supra; Marshall v. Edwards, supra. Also, since almost 40% of the population in Hinds County is black, and Plan C is designed to guarantee two safe seats for the blacks in those districts within the city, or 40% of the seats on the board of supervisors, the plan appears to border on being a scheme of proportional racial representation, which was specifically condemned by the Court of Appeals in Marshall v. Edwards, supra.
Plan C is thus laced with constitutional infirmities, and the point is that if Mr. Kirksey is unable to detect the obvious, blatant unconstitutionality of his own creation, the Court will not credit him with the ability to discern an unconstitutional dilution in other plans. A witness who condemns one plan as unconstitutional while espousing another plan which is patently so, cannot do so without damage to his credibility. Therefore the Court will largely disregard the testimony of this witness, insofar as it relates to matters which call for his opinion.
*300 Another example of this witness's unreliability was his characterization of the Belhaven area contained in Precincts 8 and 9 as one with the highest level of political participation and thus unsuitable, according to him, for inclusion in defendants' proposed District 5, when in fact Precinct 8 had the exact same percentage of voter turn-out as Presidential Hills, a black subdivision. Kirksey saw nothing unconstitutional about Plan C, but found a dilution in the defendants' proposed plan, partly because he said these inner city districts had poor voter participation, when in fact 53% of the voters in Precinct 19, one of the precincts the witness cited as exceptionally unsuited for participation in the political process, voted in the last election compared to 51% for Hinds County as a whole.
The 63.7% nonwhite population in the defendants' proposed District 5 was termed a dilution by Kirksey because it denied the black voters in that district the opportunity to elect a candidate of their choice. Yet testifying before the District Court for the District of Columbia, Kirksey stated that a total black population of 64% was sufficient in a legislative district in Mississippi to give blacks the opportunity to elect a legislator of their choice, basing this on a relevant study. He also testified that in Warren County, Mississippi, a total black population of 60% was sufficient to allow the black population to elect a legislator of their choice, if the precincts were concentrated in the city limits of Vicksburg and other urban areas. These examples illustrate the self-serving nature of the testimony of this witness, and, succinctly put, convinces the Court he is not very knowledgeable in this field.
As the Court has noted above, the plaintiffs' three proposed plans were produced by the combined efforts of Dr. Henderson, Mr. Parker and Mr. Kirksey, although Kirksey was the creator of Plan C. Whether Mr. Parker actually participated in the creation of the plans is rather unclear, but Kirksey testified that Parker did have input into the plans and approved the result reached in each case. Kirksey went on to state that the plaintiffs' three proposed plans were prepared and approved on the basis of their compliance with constitutional standards and minimization of dilution of black voting strength. Thus it is clear that in the light of the fact Plan A was created and submitted, at one time Parker, Henderson and Kirksey were all of the opinion that Plan A was constitutional under the criteria stated above.
Dr. Gordon Henderson, whom the Court recognized as an expert in the field of political science but not county redistricting, testified that he had major input into all three of the plaintiffs' proposed plans. The criteria Dr. Henderson employed were (1) one man-one vote requirements, (2) compactness of districts, (3) contiguity (4) utilizing existing precinct lines, and (5) avoiding the dilution of the black vote. He applied these criteria in drawing up proposed Plan A and testified that he was satisfied at the time Plan A was prepared that it was not a racial gerrymander.
Plan A was filed simultaneously with the defendants' proposed plan. As the chart included above illustrates, Plan A includes a proposed District 5 with a nonwhite population of 62.0%, while the defendants' plan for that district results in a 63.7% nonwhite population. It is readily apparent that the defendants' plan is more favorable to the plaintiffs' objectives in District 5 than is Plan A, and the plaintiffs discovery of Plan A's unconstitutionality was remarkably coincidental to the revelation of this fact. Again the point is that the Court is being asked to rely upon the testimony of the witnesses Henderson and Kirksey relative to the constitutionality of the defendants' plan, although Kirksey's judgment was so glaringly in error regarding Plan C, and, in the case of Henderson, Plan A drawn by the witness using the same criteria employed in drawing Plan B, was later abruptly found to contain constitutional error subsequent to the appearance of the more appealing plan of the defendants. The whole procedure smacks of gamesmanship to the Court when we are dealing with, as the en banc court noted, "[the] basic rights of American Citizens." 554 F.2d at 150. The Court is *301 the judge of the credibility of the witnesses, and felt it appropriate to outline some of the factors which influenced its consideration of the testimony of the witnesses.
The defendants object to plaintiffs' proposed Plan B because it included Precincts 8 and 9, referred to as the Belhaven area, in the northeast Jackson district, or the Eastover area, rather than placing them in District 5, as the defendants did in their plan. There is no question that the Belhaven precincts are predominantly white, and the plaintiffs Plan B attached them to northeast Jackson for this reason. The witness Ms. Hester lives in Belhaven, and she testified that it is an area with older homes to which younger people are moving, and consists of a very tightly knit community with much rental property. Ms. Hester stated that Belhaven was not an extension of Eastover, since Belhaven and Eastover are separated by a tremendous distance, both geographical and in other ways. The witness noted, and the Court takes judicial notice of this fact from its own personal knowledge, that Eastover is separated from Belhaven by Interstate 55, the huge complex of the University of Mississippi Medical Center, St. Dominic's Hospital, Murrah High School, an elementary school, Bailey Junior High School, Highway 49, the tremendous land area of Riverside Park, the Highway Patrol headquarters, Newell Field, and other state facilities. The Eastover area has newer homes, one of the highest economic levels in the city, and very little rental property. Ms. Hester had lived in Precincts 5 and 9 and stated that there was no difference between them, and she was of the opinion, and the Court agrees, that the only reason for including the Belhaven area with the northeast Jackson, or Eastover area, in the same supervisor's district was to insure that these two precincts and their predominantly white population were not included in the district they naturally belonged to, which happens to be composed of black citizens. The Court finds as a fact that Belhaven has a community of interest with the central city area, and there is no legitimate planning justification for separating this area from the central city in supervisors' districts, and especially by attaching it to the Eastover area. The only purpose for such a configuration was to maximize black voting strength in the supervisors' districts including the central area of Jackson.
The witness Holland, whose expertise impresses the Court testified at length about Plan B and pointed out how the boundary lines of the districts in Plan B were quite irregular and do not follow major thoroughfares. In particular the witness pointed out how in Plan B District 1 extends beyond the natural barrier noted above to include Precincts 8 and 9, which in his opinion was for the purpose of gerrymandering the remaining districts in favor of the black population, and the Court agrees with this assessment. Holland noted that Precincts 8 and 9 were compatible with all the areas surrounding them, and taking them out of proposed District 5 in the defendants' plan would be for the sole purpose of maximizing black voting strength.
Reverend Horace Buckley, a black, testified that there was no common interest between Precincts 8 and 9 and the black area of Jackson, but this seems to suggest that it is never appropriate to include a majority white precinct with a majority black precinct. The Court does not have before it the information necessary to, or the ability to group precincts with common socio-economic characteristics, nor is there any constitutional requirement to do so. Buckley was also of the opinion that black voters were affected by a feeling that they had no chance to have an impact on elections, but the Court is of the opinion whatever lingering feeling the black population might have in this regard will be, or should be dispelled by the new redistricting plan which we will order into effect. If defeats in the past have discouraged black voters, then the recent election victories of black candidates should have the opposite effect.
The defendants' plan was attacked by Dr. Henderson for the changes it makes in the precinct structure in Jackson, and for the manner in which it divided the central *302 city area among the various districts. Henderson said the defendants' plan would confuse the voters, ignored natural boundaries, and was a racial gerrymander because of its manipulation of precinct boundaries, inasmuch as the black population south of Woodrow Wilson street was split up, and because Precincts 8 and 9 were not included in the north Jackson area.
Hoyt Holland testified at length in support of the defendants' plan. He pointed out how the new plan used major thoroughfares as boundaries whenever possible, such as Northside Drive, Bailey Avenue, North State Street, Riverside Drive, Interstate 55, creeks and railroads. Most of these streets used by the defendants are major four-lane arteries and are easily recognizable and are natural boundaries.
The plaintiffs complained about the boundary lines Holland had created through Jackson State University, but he amply explained this to the Court's satisfaction, relating how he had considered using the adjacent street, but had decided to cut across a piece of vacant land. This decision was made after talking to the Circuit Clerk and his assistants, who pointed out the desirability of retaining College Park Auditorium as a voting place in Precinct 51. Holland emphatically stated that the defendants' plan did not cancel out or minimize black voting strength and pointed out the percentages of blacks contained in proposed Districts 2 and 5 to corroborate his testimony. The defendants' plan also took into consideration the recently annexed area of the City of Jackson. He conferred with the city planners and arrived at proposed precinct boundaries which would track those of the City of Jackson with few exceptions. The plaintiffs did not attempt to conform the county precincts to the city precincts in the newly annexed area. The United States Attorney General has filed an objection under the Voting Rights Act to this municipal annexation, and the effect of the objection is that Jackson city officials may not include the votes of the residents of this newly annexed area in the official municipal election returns. However, the Court is of the opinion that advance planning in the form of conforming the county and city precincts in this area was commendable, since whatever the result of the Attorney General's objections, the move cannot possibly be harmful, but only helpful if the voters in the newly annexed area are in the future permitted to vote in city elections.
Holland was familiar with the criteria to be used in formulating a constitutional plan and applied these criteria in creating the defendants' proposed plan. Most importantly he considered equalization of population and avoidance of minimization of black voting strength. Next he considered equalization of road and bridge mileage, compactness and equalization of land mass. On the basis of his plan's adherence to these standards Holland recommended its adoption by the Court.
Holland explained all the reasons for the precinct changes he had made in formulating the defendants' proposed plan. Precinct 27 was bisected by Northside Drive in the 1973 plan, but was utilized as boundary in the 1978 plan. The area north of Northside Drive is sparsely populated, with only 17 inhabitants in the area, so there was no problem in moving them into Precinct 83 and designating Northside Drive as the boundary between the two precincts and two supervisors' districts. The few people in the area north of Northside Drive could easily go the Precinct 83 polling place. The plaintiffs objected because all of the population of Precinct 27, the area south of Northside Drive, was black and the people living in the north area were white, but in view of the fact that there were only 17 white people involved, the Court does not feel that the objection has any merit.
The same satisfactory explanation was made in regard to the southern boundary of Precinct 16. In the 1973 plan this precinct extended beyond Woodrow Wilson and picked up the Millsaps College area in Precinct 6. This was done primarily to utilize Woodrow Wilson Drive as a boundary, since it is one of the most heavily traveled thoroughfares in the state and an excellent natural boundary. The Millsaps area was *303 taken out of Old District 2 and placed in new proposed District 5. This area involves three census blocks and in the 1970 census it had 629 whites and 17 nonwhites. Of this total 547 were living in the Millsaps College dormitories, and since most of these students would vote outside the Jackson area, their impact on Hinds County elections would be minimal. When the students in the Millsaps dormitories were omitted from the total, only 99 people were affected by the boundary change in this area. East of Precinct 16 the boundary is North State Street, one of the major streets in Jackson and an excellent natural boundary.
The same satisfactory explanation was given for every precinct change by Mr. Holland, and the Court is convinced that in every instance the ends of good planning and voter participation encouragement were served. After the precinct changes in the defendants' plan were made, the result was that 2867 whites and 1179 blacks were moved from one precinct to another, for a total of 4446 persons. This figure includes the 547 group-quartered students at Millsaps College, and without the inclusion of the dormitory students a total of 3899 people were affected. This figure represents only 1.81% of the 214,973 people the 1973 census reflected to reside in Hinds County. Since 30% of these people are under 18 years old and cannot vote, leaving 1.27% of the county residents, and statistics show that in all probability only 50% of the group will register, the changes in the precincts only directly affect .63% of the voters. This percentage is so small that the Court attaches little significance to the fact the precinct changes were made. Whatever indirect effect the changes might have on the voters can be alleviated by adequate publicity of the new districts, the polling places and the precincts. The potential for confusion of the voters is no different here than when any other redistricting change is implemented.
This Court is satisfied that the figures furnished by the defendants are more reliable and accepts them as accurate; therefore, the total deviation under the defendants' plan is 3.02% and under the plaintiffs' Plan B it is 2.97%. Court-ordered redistricting plans must equalize population with only de minimis variations. Connor v. Finch, 431 U.S. 407, 417, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977). Here the Court is satisfied that both of the plans mentioned above satisfy this requirement, with only 0.05% difference between the two, in light of the need to take into account the other criteria normally used in county supervisors' districts. The fact that Plan B might be more desirable because of its lower deviation is overcome by its manipulation of Precincts 8 and 9, which the Court has found to be a racial gerrymander, and the fact that the defendants' plan is better formulated overall.
In summation, the Court finds that the defendants' plan is the more desirable one, because of the reasons outlined above. The defendants' plan was formulated by Hoyt Holland, an exceptionally qualified expert in this field, who has served as a special master for many courts to perform this very same task, and was drawn to conform with all constitutional and desirable planning objectives in mind. The Court views this plan as far superior to any plan which purported to redistrict the county on a "social and economic" basis, as Kirksey stated had been his objective in working with the plaintiffs' plans.
The defendants have proved conclusively to the Court's satisfaction that their plan is not a racially motivated gerrymander. In fact Holland testified that all of the plans, both plaintiffs and defendants tended to maximize black voting strength, and if there is any element of racial gerrymander in these redistricting plans, it tends to favor the black population of Hinds County, which is permissible under the court's direction to formulate a remedial plan. However, at this point any similarity among the plans ends. Plan A was abandoned after it became apparent to the plaintiffs that it gave the black population of Hinds County less preference than the defendants' plan did, although Plan A was drawn by the same people using the same criteria for the *304 same purpose employed in drawing the other two plaintiffs' plans. Plan C is a blatant racial gerrymander, whose creation is "unexplainable on any grounds other than race." 554 F.2d at 144. Plan B uses a racial gerrymander to maximize black voting strength, although not to the extent Plan C does. None of the plaintiffs' plans were supported by the testimony of an expert in county redistricting, however the defendants' plan was drawn by an eminent expert in this field. The defendants' plan followed all constitutional guidelines set out in the opinion of the en banc court in this case, and by courts in other decisions. In addition, the plan utilizes the other recognized criteria of county redistricting, and was explained in detail by its draftsman.
Finally, the Court is convinced that the plaintiffs' complaint about the division of the black population in Jackson is without merit, and that the defendants have proved that this plan does not perpetuate an existent denial of access by the racial minority to the political processes. The Court has already considered and determined that there is presently equality of access to the political process in Hinds County. Going beyond this analysis, the Court is also satisfied that the remedial aspects of the defendants' plan will operate to prevent the plan from perpetuating any lingering effects of past denials of access to the political process.
Access to the political process can be denied by gerrymandering precinct lines so as to fragment what would otherwise be cohesive minority voting community. Robinson v. Commissioners Court, 505 F.2d 674, 679 (5th Cir. 1974); accord, Kirksey v. Board of Supervisors of Hinds County, supra at 149. This is true because in the context of bloc voting such a practice operates to dilute the voting strength of the black population and prevents them from electing candidates of their choice. In this case the en banc court concluded that this Court had divided the black community in such a manner that the voting age population in the two black majority population districts was less than 50% and therefore it "would be unlikely if not impossible for blacks to ever elect a candidate of their choice" under the former plan. 554 F.2d at 149.
The plaintiffs complain that the same thing has happened again, making reference to the black population south of Woodrow Wilson being divided among the supervisors' districts. However, we have already noted that some division of the black population must occur among the districts, and the city itself must be divided among the five districts to achieve any sort of population equality. The black population south of Woodrow Wilson has no special significance as opposed to the rest of the black concentration in Jackson, and this Court has the duty to consider the black population north of Woodrow Wilson in its plans also. In other words, we are more concerned with how the plan affects the black population as a whole than how the plan affects the black population south of Woodrow Wilson. In the context of the total black population of Jackson, the defendants' plan divides the black population in Jackson among the districts in such a manner that does not dilute black voting strength. The black voting age population is over 50% in two of the five districts, and the Court is convinced, using the advantage of its familiarity with this case, its observation of the demeanor of the witnesses and its assessment of their credibility, that the defendants' plan offers the black population of Hinds County a realistic opportunity to elect two of the five supervisors in Hinds County, assuming the black population votes for the same candidate. The plaintiffs seemingly confuse "realistic opportunity" with a "cinch" and although the Court is committed to and implements a plan which offers the former, we are not required to assure any group, whether racial or political, the latter.
The court in Marshall v. Edwards, supra, stated that:
[B]ecause of the almost infinite number of patterns apportionment might follow in any given geographical area, the trial judge has a wide range of discretion in adopting a plan.
582 F.2d at 931.
As our discussion above has noted, proposed District 5, the center of dispute herein, has *305 a black population of 63.7% and a black voting age population of 55.9% under the defendants' proposed plan. Under plaintiffs' proposed Plan B District 5 would have a black population of 66.7% and a black voting age population of 59.9%. Now the plaintiffs state in their proposed findings of fact and conclusions of law that black voters in District 5 do not have a "realistic opportunity" of electing a candidate of their choice under the defendants' proposed plan, but do have a "realistic opportunity" of electing a candidate of their choice under the plaintiffs' proposed Plan B. Apparently the plaintiffs feel they are able to gauge subjective concepts such as voter participation, motivation, access and success potential with a degree of accuracy which allows them to discern the cut-off point between realistic opportunity and lack thereof in a 4 percentage point difference. The Court is not so perceptive, and does not believe the plaintiffs possess that ability, especially since no expert in redistricting testified for the plaintiffs in regard to these proposed plans. At any rate, surely the "wide range of discretion" the Court of Appeals has invested us with will allow us to choose between plans containing only a 4 percentage point difference, in the light of the other considerations we have discussed above.
Therefore the Court finds that the defendants' plan is superior to any other plan the plaintiffs have proposed. The defendants' plan was supported by far more credible witnesses than the plaintiffs' proposed plans, and in the Court's discretion more nearly approaches the constitutional and practical ideal for county redistricting plans.
A Judgment conforming to this Memorandum Opinion, approved as to form by counsel for all parties, which adopts the defendants' proposed plan, will be presented to the Court within the time and in the manner provided for in the Local Rules.